**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Case No. 09-cv-01135-WJM-KMT
(consolidated with Civil Action No. 10-cv-00462)

COLORADO RAIL PASSENGER ASSOCIATION,

      Plaintiff,

v.

FEDERAL TRANSIT ADMINISTRATION,

      Defendant.

---

## ORDER AFFIRMING RECORD OF DECISION

---

Plaintiff Colorado Rail Passenger Association brings this complaint seeking judicial review of Defendant Federal Transit Administration's October 17, 2008[1] final Record of Decision approving the plans to redevelop the transit options at Denver Union Station.  Plaintiff alleges that the process underlying the Record of Decision did not comport with the National Environmental Policy Act.

This case is before the Court on the merits.  For the reasons set forth below, the Court AFFIRMS the Record of Decision.

### I.  STANDARD OF REVIEW

Plaintiff brings this action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, which subjects federal agency action to judicial review.  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573 (10th Cir. 1994).  Under the APA, the

---

[1]  The Court notes that the Record of Decision was published in the Federal Register on November 18, 2008.  73 Fed. Reg. 68,494 (Nov. 18, 2008).

Court may "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations. . . ."  5 U.S.C. § 706(2).

Under the APA, the Court does not review an agency action *de novo*, but rather sits as an appellate body.  *Center for Native Ecosystems v. Salazar*, 711 F.Supp.2d 1267, 1272 (D. Colo. 2010) (citing *Olenhouse*, 42 F.3d at 1580).  An agency action is afforded the presumption of validity; "the burden is on the petitioner to demonstrate that the action is arbitrary and capricious."  *Copar Pumice Co., Inc. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010).  "Agency action is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,' or if the agency action 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.*

In determining whether an agency action is arbitrary and capricious, the Court must consider "the full administrative record that was before all decision makers."  *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) (citations omitted).

## II.  FACTUAL BACKGROUND

This case is about the process underlying redevelopment of Denver Union Station ("DUS").  The process of redeveloping DUS began in 2001 and, for purposes of this action, culminated when the Federal Transit Administration ("FTA" or "Defendant") issued its Record of Decision ("ROD") on October 17, 2008.  (AR 7985-8718.)  The

Administrative Record in this case contains over 27,000 pages of documents.  The following recitation of facts is a brief summary of that seven year process, focusing on the parts of the process that are germane to this action.

In 2001, the Regional Transportation District ("RTD") purchased 19.85 acres of land which includes the DUS building and railway lines on the property.  (AR 36.)  RTD sought to develop DUS as the multi-modal transportation hub of its larger FasTracks program.  (AR 8055-8056.)  RTD entered into an Intragovernmental Agreement with the City and County of Denver, Colorado Department of Public Transportation, and the Denver Regional Council of Governments (collectively "Partners") to fund the development of a master plan, a preliminary engineering statement, and any environmental statements necessary.  (AR 23847.)

In June 2002, FTA notified RTD that federal funding of the DUS project would require the preparation of an environmental impact statement ("EIS") to comply with the National Environmental Policy Act ("NEPA").  (AR 236.)  To begin this process, FTA published a Notice of Intent to conduct an EIS in the Federal Register on June 4, 2002. 67 Fed. Reg. 38,544 (June 4, 2004) (AR 234-35.)

On June 20, 2002, the Partners held both an agency scoping meeting and a public scoping meeting.  Key local, state, and federal agencies were invited to the agency scoping meeting; thirteen attended.  (AR 8314.)  The public scoping meeting was advertised in newspapers of general circulation, posted on the DUS website (www.denverunionstation.org), and sent via e-mail to persons on the project mailing list. (AR 690, 8314.)  Over 200 people attended the public scoping meeting.  (AR 8314.)

At each of these meetings, members from the project team presented an

overview of the proposed Master Plan for DUS, explained the EIS process and its projected schedule, and outlined the draft vision and goals for the project.  (AR 8314.)  This presentation was followed by a question and answer period and a time for public comment.  (AR 8314.)  Handout materials describing the project were distributed, as well as forms for providing written comments.  (AR 8314.)

Also at this initial scoping meeting, the Union Station Advisory Committee ("USAC") was formed.  (AR 8315, 10555.)  All members of the public at the meeting were invited to participate.  As originally composed, USAC had ninety-six members representing thirty-six stakeholder categories.  (AR 9574.)  The USAC first worked together to compose the vision statement and goals for DUS.  (AR 20068, 20093.)  The Vision Statement, which remained unchanged throughout the seven year process, follows:

> DUS will be a multimodal transportation center of international significance and a prominent and distinctive gateway to downtown Denver and the region.  The Station will bring critical elements of the public and private local, regional, statewide, and national transportation systems, both existing and future, together with private development and inspiring civic features.  DUS will create an exciting setting that will improve the connections between all transportation modes, respect the character and historical significance of the Station and its adjacent neighborhoods, and provide a stimulating environment for public activity and economic vitality.

(AR 9290.)  USAC met more than twenty times between June 2002 and October 2004, when the initial master plan and zoning was approved by Denver City Council.  (AR 9574.)  All USAC meetings were open to the public and were advertised on the project website: www.denverunionstation.org.  (AR 691, 17766.)  Some USAC meetings were

also advertised in newspapers of general circulation and through direct e-mails to persons on project mailing lists.  (AR 23166.)

Members of the USAC also formed break-out groups according to interests such as rail, traffic, bus, environment, zoning, historic preservation, and land-use issues. (AR 691, 8319-22.)  The break-out groups met separately to discuss the issues relevant to them.  The break-out groups would then make recommendations to the USAC at various points during the project development process.  (*Id*.)

A Technical Advisory Committee ("TAC") was also formed consisting of representatives of the Partners as well as representatives from transit agencies and companies (*e.g.*, Amtrak, BNSF, Greyhound), environmental agencies (*e.g.*, EPA, Air Quality Council), and other governmental agencies (*e.g.*, Colorado Historical Society, Denver Housing Authority).  (AR 8375-8379.)  The TAC provided technical guidance and direction to the process of developing alternative design plans and screening those alternatives.  (AR 20002-20006.)

A second town hall meeting was held on September 12, 2002.  (AR 8316.)  This meeting was again advertised widely and open to the public.  The Partners introduced the project's proposed purpose and need statement as well as fourteen alternative designs that had been developed by the project team.  (AR 8316.)  The purpose of the DUS project, as stated in the Final EIS is as follows:

> The purpose of the proposed project is to enhance the function of DUS as a multimodal transportation center for the Metro Denver Region and the entire State of Colorado. Improving DUS will bring together the various modes of transportation into one place and provide efficient and convenient access to and from downtown Denver.  The proposed transportation improvements would help relieve

traffic congestion, improve air quality, and provide additional mode options for the traveling public.

With an expanded multimodal center, an opportunity exists to provide effective connections between the various transportation modes and services planned to serve DUS. These modal and service connections are expected to improve regional mobility and provide greater access to employment, community services, and other regional destinations.

It is also anticipated that improved transit connections to the region will increase transit use due to the variety of services offered, the multiple destinations served, the ease of transfers, and the improved passenger convenience. Without such an expanded multimodal center, current and planned transportation services would be limited in service effectiveness and passenger convenience. DUS would not be able to accommodate the level of transit service needed for the growing region and passengers would be forded to use multiple transfer facilities to make connections. Traffic flow on major downtown streets would be affected, due to bus and rail services having to terminate at multiple downtown locations instead of converging at a central location to distribute passengers. Project transit ridership would likely be lower under a decentralized system, due to reduced passenger convenience and less ease of transfer to reach destinations outside of downtown. The opportunity exists to re-establish DUS's historic prominence as a full-service transportation hub and reinforce it as a distinctive gateway to downtown Denver, the Metro Denver Region, and the State of Colorado.

(AR 8042-45.) Over 150 people attended this second town hall meeting and, based on their comments, nine additional alternative design plans were developed. (AR 8316.)

With twenty-three alternative designs proposed for the DUS project, the project team developed a screening process. This process and the criteria encompassed therein were reviewed with the public and the project committees, including the USAC and the TAC. (AR 20247.) The four levels of screening where: (1) fatal flaw analysis;

(2) general screening; (3) detailed screening; and (4) additional detailed screening.  (AR 20240, 23307-312.)

The project team allocated each of the twenty-three alternatives into one of five groups (lettered A-E) according to common characteristics such as placement of rail and light rail tracks below ground or at-grade or the location of the commercial bus terminal.  (AR 4128-36.)  These alternatives then progressed through a four-step screening process at USAC meetings over the next two years.  A description of the process and its results follows:

•    Tier I (fatal flaw analysis): Sketch-level engineering drawings and cross-sections of each alternative were prepared for public review and discussion.  (AR 20355.) These drawings were screened for safety-related issues and irreconcilable conflicts between proposed transit and existing transit (principally automobile traffic).  (AR 362, 20273-74.)  After public discussion, eight alternatives were eliminated during the fatal flaw analysis.  (AR 4137.)

•    Tier II (general screening): Refinements were made to the engineering drawings and cross-sections as necessary to consider the following criteria[2]:  their ability to provide anticipated operational capacity, connectivity between modes of transportation, private development potential, and efficient use of the DUS building.  (AR 4137-39.)  After public discussion, six alternatives were eliminated during the general screening process.  (AR 4137.)

---

[2]  During the screening process, alterations and/or variations to the twenty-three originally proposed alternatives were made.  (AR 20526.)  This resulted in an additional twenty-one alternatives having been screened or considered at some point during the process.  (AR 20526.)

- Tier III (detailed screening): The detailed screening process involved transportation effectiveness, impact on the existing transportation system, financial viability, historic preservation, impact on the natural and build environment, urban design and neighborhood integration, and constructability. (AR 20248.)  Three alternatives were eliminated during the detailed screening process, primarily for poor connectivity and constructability issues.  (AR 4133-37.)

- Tier IV (additional detailed screening): At step four of the screening process, the remaining six alternatives were put into three groups based on similarities in the configuration of their primary transit operations (light rail, passenger rail, and commercial bus service).  (AR 4129-35.)  The two alternatives in each group were re-evaluated based on the criteria used in the detailed screening process with the addition of walk distances, flexibility, and access between all transportation modes.  (AR 4131-35.)  The alternative that faired better in these categories advanced while the other alternative was eliminated.  (AR 4137.)

Following completion of the screening process, three alternatives remained. Alternative A2 placed both light rail and passenger rail at-grade.  (AR 4129.)  Alternative C3 placed passenger rail at-grade and light rail underground.  (AR 4131.)  Alternative E2 placed both passenger rail and light rail underground.  (AR 4134.)  More detailed engineering studies were conducted as to each of these options and more detailed drawings were made. (AR 10253.)

The final three alternatives were then evaluated on the following criteria: transportation operations and accommodations, connection and transfers between

major modes, opportunities for private development, historic preservation, traffic impacts, impacts to built environment, urban design and neighborhood integration, constructability and phasing of major modes, parking and service, additional carriers, mall shuttle/additional downtown circulator, and cost/revenue.  (AR 20473.)  Input on the final three alternatives was sought from USAC, TAC, and other involved agencies.  (AR 20358; 20403.)  Additionally, the three remaining alternatives were also presented to the public at the third town hall meeting, held in January 2004.  (AR 8317.)

Following all of these meetings, Alternative A2 was ultimately eliminated because it required at-grade crossings on Wewatta Street, which was deemed unacceptable due to the traffic impacts.  (AR 20493.)  Though both Alternative E2 and C3 were acceptable, Alternative E2 was preferred because C3 had a stub-end station for light rail while E2 allowed for a through station.  (AR 20353.)  Thus, Alternative E2 was identified as the preferred option for DUS.  (AR 4156.)

The Draft Environmental Impact Statement ("DEIS") was published in March 2006.  (AR 4017.)  It considered the environmental impacts of taking no action on the DUS site ("No Action Alternative") and Alternative E2, referred to as the "Vision Plan Alternative" in the DEIS.  (AR 4020.)  When fully implemented, the Vision Plan Alternative would have placed light rail, passenger rail, and regional bus facilities underground at DUS.  (AR 4147.)  Due to financial constraints, however, the DEIS divided the Vision Plan Alternative into subparts and placed greater emphasis on "Phase I" of the Vision Plan Alternative.  (AR 4151-56.)  Phase I included construction of a below-grade light rail station comprised of three tracks and platforms, enhancing the at-grade passenger rail service, relocating the 16th Street Mall Shuttle turn-around,

and other related site improvements.  (AR 4020.)

The 45-day public review period for the DEIS was from March 24, 2006 through May 8, 2006.  A public hearing on the DEIS was held on April 19, 2006.  (AR 4020, 4648, 8317.)

After the DEIS was published, two major set-backs to implementation of the Vision Plan occurred.  First, the railroads informed RTD that they would not allow light rail vehicles to operate within their rights-of-way.  RTD has planned for the Gold Line, which was being developed to serve the transportation corridor from Arvada to DUS, to utilize light rail technology within the railroads rights-of-way.  (AR 5123.)  The railroads' reversal on light rail access forced RTD to change the Gold Line to commuter rail rather than light rail.  This change, in turn, forced reconsideration of the Vision Plan Alternative.  It diminished the number of light rail lines and increased the number of passenger rail lines necessary for proper operation.  (AR 24003-29.)  Additionally, because the Gold Line was the only light rail planned to access DUS from the north, it was no longer necessary for the light rail to be accessible from that direction.  (*Id*.)

Another set back to implementation of the Vision Alternative occurred in fall 2007.  On October 11, 2007, for the first time, the Federal Railroad Administration ("FRA") expressed safety concerns with a below-grade passenger rail station.  (AR 6063.)  Full implementation of the Vision Plan Alternative would have put all passenger rail lines below-grade.  (AR 4147.)  Because FRA would not allow passenger trains to use a below-grade station, it was clear that the Vision Plan evaluated in the DEIS would have to be substantially revamped.  (AR 15049-50, 15128.)  Specifically, the project team had to devise an alternative that kept the rail components at-grade while still

-10-

meeting the purpose and need of the project.

After significant discussion, the project team arrived at a final plan that would accommodate FRA's safety concerns and the railroad's right-of-way issues while still fulfilling the purpose and need of the DUS project. (AR 6186.) It featured eight commuter rail tracks at-grade next to DUS, a regional bus facility below grade under 17th Street, and two light rail tracks and a light rail station adjacent to the Consolidated Main Line (primarily used for freight hauling trains) two blocks away at the end of 17th Street. (AR 6186.) This new plan is referred to as the "Build Alternative". (AR 8050.)

FTA and RTD jointly issued a Final Environmental Impact Statement ("FEIS") on August 15, 2008. (AR 6554-7190.) The FEIS compared the environmental impacts of the No Action Alternative, the Phase I Alternative[3], and the Build Alternative. (AR 8052-71.) The FEIS designated the Build Alternative as the preferred option. (AR 7987.) The public comment period for the FEIS ran from July 11, 2008 until August 25, 2008 and a public hearing was held on September 10, 2008. (AR 7987, 8318, 9398.)

FTA approved the FEIS in a Record of Decision ("ROD") dated October 17, 2008. (AR 10251-65.) The ROD reviewed the process FTA, RTD, and the other entities involved had undertaken to arrive at the Build Alternative as the preferred option and found that the process had satisfied the applicable requirements under NEPA. (AR 10251.)

Plaintiff filed this action on May 18, 2009 alleging that the process by which the Build Alternative was selected for the DUS development violated NEPA. The case was

---

[3] Even though the Vision Plan was not longer a viable option, the environmental impacts of the Vision Plan were retained in the FEIS for continuity purposes. (AR 8071.)

briefed by the parties on its merits.  (ECF Nos. 32, 41, 49, 68 and 83.)  The Court also allowed RTD, the City and County of Denver, and the Colorado Department of Transportation to file amicus briefs.  (ECF Nos. 39, 40, and 48.)   All interested parties having been afforded the opportunity to be heard, the case is ripe for review by this Court.

### III.  ANALYSIS

In the National Environmental Policy Act of 1969 ("NEPA"), Congress specifically "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment," and resolved "to recreate and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331.  "These sweeping goals have inspired some commentators to call NEPA an environmentalist Magna Carta."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193 (D.C. Cir. 1991).  "NEPA commands agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity."  *Id*. at 193-194.

Under NEPA, "major Federal actions significantly affecting the quality of the human environment" must be preceded by an EIS.  42 U.S.C. 4332(2)(C).  The EIS requirement serves two important functions: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the

decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).  NEPA specifies five specific issues which must be addressed in the EIS:

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. 4332(2)(C).  Thus, "through a set of 'action-forcing' procedures" NEPA requires agencies to take a "hard look" at the environmental consequences of proposed actions.  *Robertson*, 490 U.S. at 350.

The Court reviews an agency's NEPA process under the deferential abuse of discretion standard of review.  *Citizens Against Burlington*, 938 F.2d at 194.  As the Supreme Court has observed, "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences".  *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980) (*per curiam*) (citation and quotation omitted).

The Tenth Circuit has held that the district court's objective in reviewing an EIS "is not to 'fly speck' the environmental impact statement, but rather, to make a pragmatic judgment whether the environmental impact statement's form, content and preparation foster both informed decision-making and informed public participation."

*Custer Cty. Action Assoc. v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001).  The Court

is to apply "a rule of reason standard (essentially an abuse of discretion standard) in

deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant

enough to defeat [NEPA's] goals of informed decision making and informed public

comment."  *Fuel Safe Washington v. F.E.R.C.*, 389 F.3d 1313, 1323 (10th Cir. 2004)

(internal quotation omitted).

      Plaintiff's arguments against FTA's Record of Decision essentially boil down to

four points: (1) the DEIS and FEIS prepared in this case were flawed due to a conflict of

interest on the part of a preparer; (2) FTA improperly limited the scope of the FEIS by

failing to include connected action and failing to fully consider the cumulative effect of

the project; (3) FTA failed to consider all reasonable alternatives; and (4) FTA failed to

comply with Section 4(f)'s requirements.  The Court will consider each of these

arguments in turn below.

## A.    Conflict of Interest

      Plaintiff alleges that the FTA violated NEPA because the contractor it chose to

prepare the EIS had a conflict of interest that compromised the integrity of the NEPA

process.  (ECF No. 34 at 8-13.)

      Federal regulations provide that a project's EIS should be "prepared directly by

or by a contractor selected by the lead agency or . . . a cooperating agency."  40 C.F.R.

§ 1506.5(c).  If a contractor is hired, it is required to execute a disclosure statement

specifying that it has "no financial or other interest in the outcome of the project."  *Id*.  In

choosing a contractor, the agency should avoid any conflicts of interest.  *Id*.; *see also*

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations ("Forty Questions"), 46 Fed. Reg. 18,026, 18,031 (Council on Envtl. Quality 1981) (stating that a contractor with a conflict of interest "should be disqualified from preparing the EIS.").

Whether a contractor has a conflict of interest hinges on the definition of "financial or other interest" in Section 1506.5(c).  The Tenth Circuit has observed that this phrase "has eluded precise definition."  *Associations Working for Aurora's Residential Environment ("AWARE") v. Colorado Dept. of Trans.*, 153 F.3d 1122, 1127 (10th Cir. 1998) (hereafter "AWARE").   Generally, "absent an agreement to perform construction on the proposed project or actual ownership of the construction site, it is 'doubtful that an inherent conflict of interest will exist' unless 'the contract for EIS preparation . . . contains . . . incentive clauses or guarantees of any future work on the project.'" *Id*. at 1127 (quoting Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,263, 34,266 (Council on Envtl. Qulaity 1983)).  The issue here is whether the contractor that prepared the EIS in this case had a conflict of interest that should have disqualified it from participating in the process.

In this case, RTD originally contracted with Parsons Brinkerhoff and Jones Lang LaSalle d/b/a Union Station Alliance to conduct an Environmental Assessment.[4]  (AR 11743.)  FTA informed RTD that it would prefer that a full environment impact

---

[4]  An environmental assessment is another method of fulfilling NEPA's procedural requirements.  42 U.S.C. § 4332(2)(C).  An environmental assessment contains considerably less detail than an environmental impact statement and is the preferred option where it is uncertain whether a proposed action will significantly affect the environment.  *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006) (citing 40 C.F.R. § 1508.9).

statement be prepared for the DUS project.  (AR 240.)  RTD modified its contract with

the Union Station Alliance accordingly.  (AR 12130-32.)

Plaintiff does not argue that the Union Station Alliance had a conflict of interest.

Rather, Plaintiff focuses on a different company, Jacobs, Carter & Burgess ("Jacobs").

In 2005, RTD contracted with Jacobs to serve as the Project Management Consultant

(PMC) on its overall FasTracks project.  (AR 13466.)  Redevelopment of DUS is a

central part of the FasTracks project and, therefore, one of the tasks given to Jacobs as

PMC was to coordinate and review the environmental impact statements for DUS.  (AR

12734, 12807.)  Gina McAfee is the employee at Jacobs that was tasked with that duty;

she is named in the FEIS as the "RTD FasTracks EIS Manager".  (AR 8334.)  McAfee

was not actually employed by RTD; she served as an adjunct of the RTD staff but was

employed by Jacobs.  (AR 13995, 17763.)

Plaintiff argues that the FEIS is tainted by a conflict of interest because Jacobs,

as a project manager for the overall FasTracks program, had an economic interest in

encouraging selection of the Build Alternative as the preferred option.  Plaintiff contends

that this conflict of interest compromised the NEPA process because it resulted in the

FasTracks components of the plan, specifically the Build Alternative, being favored over

the No Action Alternative or proposed alternatives that emphasized other transportation

options over FasTracks components.  (ECF No. 32 at 11.)

However, Plaintiff has cited nothing in the record showing that Jacobs had a

financial incentive to manipulate the DUS EIS process.  Jacobs's contract with RTD

included a conflict of interest provision that prohibited Jacobs from "perform[ing] any

new or follow-on work for corridor DEIS/FEIS, Preliminary Engineering, Final Design,

Construction, or Design/Build contract." (AR 12466-67.) While there was certainly overlap between FasTracks and the DUS EIS in that how FasTracks would be implemented depended, in part, on how the passenger rail and light rail tracks would be aligned at DUS. However, Plaintiff has failed to point out any incentive clauses or guarantees of future work in Jacobs's contract that would have been significantly impacted by the results of the EIS process. As such, Plaintiff has failed to establish a conflict of interest that violated § 1506.5(c).[5]  *See Northern Crawfish Frog v. Federal Highway Admin.* 858 F. Supp. 1503, 1529 (D. Kan. 1994) (where engineering firm was merely a participant in the preparation of the EIS and had no incentives or guarantee of future work, there was no conflict of interest).

Plaintiff also argues that Jacobs, through McAfee, "essentially assumed primary responsibility for preparation of the DU DEIS/FEIS NEPA documents." (ECF No. 68 at

---

[5]  Plaintiff also argues that McAfee improperly influenced the public comment process after the DEIS was issued. (ECF No. 32 at 11-12.) On the last day of the public comment period, McAfee sent an e-mail to Ellen Ittelson, an employee of the City and County of Denver, asking Ittelson to solicit favorable comments. (AR 19326.) Presumably in response to Ittelson's request, a number of last-minute comments favorable to the development were posted to the website. Plaintiff argues that its comments, as well as comments from its members, were ignored in favor of the positive comments solicited by McAfee. (ECF No. 32 at 13.)

Defendant has acknowledged that Plaintiff's comments were omitted from the FEIS and ROD. It claims that the omission was inadvertent rather than malicious. The Administrative Record supports Defendant's contention. The Record reflects that the preparers were genuinely caught off guard when notified that not all comments were in the FEIS. The Record also shows that, once made aware of the additional comments, Defendant considered them and supplemented the FEIS with Plaintiff's and its member's comments. (AR 19822.) Because Defendant has explained the inadvertent omission of Plaintiff's comments, Plaintiff has failed to show any dispute as to whether its comments were fully considered during the decision-making process.

The Court views the dispute over Plaintiff's comments and the comments solicited by McAfee as a red herring. To the extent that there was any wrongdoing, it certainly did not override the validity of the exhaustive seven-year development process described above.

17.)  However, it fails to cite any factual or legal support for this argument.  As the chief

applicant for federal funds in this case, RTD had a duty to oversee the EIS process.  40

C.F.R. § 1506.5(c).  That duty was primarily delegated to McAfee in this case.  The

record shows that McAfee had an administrative oversight role in the EIS process but

there is no indication that she dominated the process.  In the FEIS, she was merely one

of sixty-eight consultants and "supplemental preparers" listed.  (AR 8334.)  Even

assuming that Jacobs had a conflict of interest, and that such conflict of interest was

imputed to McAfee, one cannot reasonably conclude that the fact that one person

amongst sixty-eight overseeing the EIS process had a possible conflict of interest

impermissibly tainted the entire process.

Additionally, the Court finds that, even if there was a conflict of interest, FTA

exercised sufficient control over the process such that the integrity of the NEPA process

was not compromised.  "When reviewing an EIS prepared by a contractor who has

allegedly breached a requirement imposed by 40 C.F.R. § 1506.5(c), the ultimate

question for the court is . . . whether the alleged breach compromised the objectivity

and integrity of the NEPA process."  *AWARE*, 153 F.3d at 1129 (quotation and citation

omitted).  The Tenth Circuit has held that the Court "can evaluate the oversight that the

agency provided to the environmental impact statement process as a factual matter and

make a determination upholding the environmental impact statement."  *Id*.  Not every

violation of the NEPA regulations warrants reversal of an agency determination.  *Id*. n.8

(late filed conflict disclosure that violated the NEPA regulations did not warrant reversal

when agency exercised sufficient oversight of the process); *Citizens Against Burlington*,

938 F.2d at 202 (NEPA violation did not warrant reversal when the error did not

-18-

"compromise the objectivity and integrity of the NEPA process").

Having reviewed the portions of the record cited by the parties, the Court finds that, to the extent there was a conflict of interest, it did not compromise the integrity of the NEPA process.  The FTA was intimately involved with the NEPA process from the beginning to the end.  RTD originally envisioned preparation of an environmental assessment rather than an environmental impact statement.  However, at FTA's insistence, RTD adjusted its plan and prepared a more detailed and comprehensive environmental impact statement.  (AR 236-37.)  After the DEIS had been published, the FTA was involved in reviewing the public comments and provided meaningful responses and substantive input.  (AR 2603-23.)  The FTA reviewed a draft of the FEIS prior to it being issued and again provided substantive comments.  (AR 10838-59.) Further evidence of FTA's active involvement with the EIS process is the fact that it issued substantive opinions on issues that arose during the EIS process, such as a letter to the Colorado State Historic Preservation Officer outlining how the Union Station Project was independent from the surrounding private development for purposes of the EIS.  (AR 6455-62.)

Because the FTA exercised sufficient oversight throughout the process, any conflict of interest on the part of Jacobs did not impermissibly compromise the NEPA process in this case.  *See Brandon v. Pierce*, 725 F.2d 555, 564 (10th Cir. 1984) (overlooking conflict of interest when agency "substantially carried out its [NEPA] duties by making the ultimate decision and giving the required notice of that decision.").

**B.     Scope of the EIS**

Plaintiff next argues that the FTA violated NEPA because it failed to include the

private development surrounding DUS within the scope of the EIS.  (ECF No. 34 at 13-15.)  Federal regulations require an agency to consider all "connected" actions in the same EIS.  40 C.F.R. § 1508.25(a).  An EIS must also consider the cumulative effect of all past, present, and reasonably foreseeable future actions.  40 C.F.R. § 1508.25; 40 C.F.R. § 1508.7.  "The purpose of this requirement is to prevent an agency from dividing a project into multiple actions, each of which individually has insignificant environmental impact, but which collectively have a substantial impact."  *Wilderness Workshop v. United State Bureau of Land Mgmt.*, 531 F.3d 1220, 1229 (10th Cir. 2008).

 1. <u>Connected Actions</u>

 Federal regulations define "connected" actions as follows:

> Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement.  Actions are connected if they:
>
> (i) Automatically trigger other actions which may require environmental impact statements.
>
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
>
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1).

 During the EIS process, FTA made an explicit finding that the federally-funded transportation development at DUS was not "connected" to the surrounding private development.  (AR 6460-61, 8262.)  The FTA's finding was based on its conclusion that the private development: (1) did not depend on the DUS transportation improvements; (2) did not affect the selection of the Build Alternative as the preferred option; (3) will be

paid for by private funds; and (4) did not utilize federal funds or require federal approval.  (AR 8262.)  "When called upon to review factual determinations made by an agency as part of its NEPA process, short of a 'clear error of judgment' we ask only whether the agency took a 'hard look' at information relevant to the decision."  *New Mexico ex rel. Richardson*, 565 F.3d at 704.  As discussed below, the Court finds that FTA took a hard look at the evidence in the record before finding that the private development was not connected to the DUS project.

There is no dispute as to the evidentiary support in the record for FTA's third and fourth findings regarding funding of the private development.  The record shows, and Plaintiff admits, that the private developments will be funded solely with private funds.  (AR 15077-92; ECF No. 68 at 32.)  There is no contention that any of the private development required will utilize federal funds or that it required federal approval.

Plaintiff instead argues that the private development is connected with the DUS project because implementation of the Build Alternative will spur additional private development.  (ECF No. 38 at 60.)  Even assuming this is true, a federally-funded project is not "connected" to another, privately-funded action, simply because it makes future development more likely.  *See Wilderness Workshop*, 531 F.3d at 1231 ("Under the applicable definition of connected action, the fact that the existence of a pipeline may encourage additional gas wells, and probably will serve additional gas wells, does not mean necessarily that additional wells are connected actions.").

Plaintiff also argues that the value of the land surrounding Union Station will be increased by implementation of the Build Alternative and, therefore, the private development is a connected action.  (ECF No. 68 at 32.)  The Court does not doubt that

improving and expanding transportation options at DUS may increase the value of the surrounding land.  But it fails to see how the fact that land value will increase around the project shows that it is "connected" to the private development.  NEPA is a statute protecting environmental policy and environmental issues; an agency is not required to consider purely economic effects in its EIS.  *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 234 (5th Cir. 2006) ("NEPA does not require such an examination of 'purely economic' impacts.").  Thus, the fact that the Build Alternative may impact the value of the private development does not make them connected actions.

There is also sufficient evidence in the record supporting the FTA's finding that the private development did not affect the selection of the Build Alternative as the preferred option.  Although one of the general screening criteria was "[o]pportunities for private development, including the amount of potential at-grade development sites with street frontage" (AR 4125), private development was mentioned as a basis for eliminating only two proposed alternative plans.  (AR 4138-39.)  Alternative A1 was eliminated "due to poor operational capacity, poor connectivity, lack of future expansion capacity, and limited development potential along Wewatta Street."  (AR 4138.)  Public Submittal Number 1 was eliminated "due to poor transportation phasing flexibility, poor pedestrian permeability and connectivity on site, and poor potential for joint development and integration of retail uses along Wewatta Street."  (AR 4139.)  Because the lack of potential for private development was but one factor in the decision to eliminate them from consideration, it was not an abuse of discretion for the FTA to find that the potential for private development did not impact the selection of the Build Alternative as the preferred option.

Finally, the record shows that the FTA took a hard look at the evidence before finding that the private development was not dependent on the selection of the Build Alternative as the preferred option.  Plaintiff contends that "most of the private development will not proceed unless the associated DUS development takes place." (ECF No. 68 at 26.)  However, Plaintiff fails to support this contention with any citation to the record and, in fact, the record is replete with evidence to the contrary.  The Metro Vision 2030 Plan shows that the Denver metropolitan area has been one of the fastest-growing regions in the country over the last fifteen years.  (AR 1196.)  Forecasts show that its population is expected to grow by over a million people by 2030.  (AR 1208; AR 6458.)  To accommodate this anticipated population increase, the Metro Vision Plan encourages infill and redevelopment of under-utilized areas in the urban core.  (AR 1207.)  In furtherance of this plan, the City and County of Denver changed its zoning around DUS in 2004 to encourage mixed-use development.  (Amicus Brief of City and County of Denver (ECF No. 40) at 8-9.)

At the time the FEIS was prepared, which was necessarily before the ROD was issued, more than 3,500 housing units had been built, planned, permitted or were under construction in the vicinity of DUS.  (AR 8258.)  Thus, there is no support for Plaintiff's contention that the private development surrounding Union Station would not have occurred but for selection of the Build Alternative.  Rather, there is more than sufficient evidence in the record to support FTA's finding that the private development would have occurred regardless of which option was chosen during the DUS EIS process.

In sum, the Court finds that the FTA took a hard look at the evidence in the record before determining that the private development surrounding Union Station was

not "connected" to the project for purposes of 40 C.F.R. § 1508.25(a)(1). As such, the

Court has no reason to conclude that this finding was erroneous. *Forest Guardians v.*

*U.S. Fish and Wildlife*, 611 F.3d 692, 711 (10th Cir. 2010).

Additionally, the Tenth Circuit has held that "projects that have 'independent

utility' are not 'connected actions' under 40 C.F.R. 1508.25(a)(1)(iii)."[6] *Custer Cty.*

*Action Cmte.*, 256 F.3d at 1037. "The crux of the [independent utility] test is whether

each of the two projects would have taken place with or without the other and thus had

independent utility." *Wilderness Workshop*, 531 F.3d at 1229; *see also Utahns for a*

*Better Transportation v. United States Dept. of Trans.*, 305 F.3d 1152, 1183 (10th Cir.

2002) ("An inquiry into independent utility reveals whether the project is indeed a

separate project, justifying the consideration of the environmental effects of that project

alone.")

FTA argues that the DUS project and the surrounding private development have

independent utility. The Court agrees. The Build Alternative serves the purpose of

increasing transportation options for the downtown Denver area regardless of whether

the private development was built. On the other hand, the private development has the

independent utility of infilling a previously underutilized part of the downtown Denver

district. While much of the private development was designed to take advantage of the

increased transportation options in the Build Alternative, the fact that the transportation

---

[6] Plaintiff argues that some courts have rejected the "independent utility" test as inconsistent with CEQ regulations. (ECF No. 68 at 29 (citing Daniel R. Mandelker, NEPA Law and Litigation, §§ 3:4, 3:6 (2009).) However, this Court is bound by Tenth Circuit law and, despite Plaintiff's invitation, cannot ignore binding precedent on this issue. Tenth Circuit law is clear that actions with "independent utility" are not "connected" for purposes of 40 C.F.R. § 1508.25. *Utahns for Better Transportation*, 305 F.3d at 1183.

elements of the DUS project and the surrounding private development are mutually beneficial does not make them connected *per se*. *See id.*; *San Juan Citizens Alliance v. Salazar*, 2009 WL 824410, *12 (D. Colo. March 30, 2009) ("where administrative record showed that new development would have occurred regardless of the federally-funded project, actions were not connected).

Accordingly, the Court finds that FTA's failure to consider the private development surrounding DUS as a connected action was not an abuse of discretion.

2.   <u>Cumulative Effects</u>

Even where an agency is not required to analyze the full impact of another project, the agency "must still adequately analyze the cumulative effects of the project within each individual EIS." *Earth Island Institute v. United States Forest Service*, 351 F.3d 1291, 1306 (9th Cir. 2003). Cumulative effects are defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. 1508.7. In this circuit, the test for whether particular actions are cumulative is "whether the actions were so interdependent that it would be unwise or irrational to complete one without the others." *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 430 (10th Cir. 1996) (citing *Park Cty. Resource Council, Inc. v. United States Dep't of Agric.*, 817 F.2d 609 (10th Cir. 1987)).

In a section entitled "Secondary and Cumulative Effects", the FEIS discusses the

combined impact of the Build Alternative and the proposed private residential and commercial development on the following categories:  social environment, parks and public facilities, public safety and security, utilities, energy, air quality, and water resources and quality.  (AR 8261-70.)  Plaintiff recognizes that the FTA considered these issues but argues that this was not sufficient to constitute a "hard look" because the FTA failed to consider the cumulative effects of private development on the "construction and post-construction vehicular traffic, historic resources, noise, and visual resources."  (ECF No. 68 at 27.)

"NEPA does not require that an agency discuss every impact in great detail, it simply requires a reasoned evaluation of the relevant factors."  *Forest Guardians v, United States Forest Serv.*, 495 F.3d 1162, 1172 (10th Cir. 2007).  The Court's role in reviewing an EIS is "not to question the wisdom of the agency's ultimate decision or its conclusion concerning the magnitude of indirect cumulative impacts." *Fuel Safe Washington v. Federal Energy Regulatory Commission*, 389 F.3d 1313, 1331 (10th Cir. 2004).  Rather, the Court is to "examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999).

Having reviewed the relevant parts of the record, the Court finds that the FTA presented the cumulative effects of the proposed private development surrounding Union Station in a reasonable and good faith manner that would allow the public to make educated, informed comments and the agency to make an informed decision.

NEPA requires no more.  *Forest Guardians*, 495 F.3d at 1172.

## C.   Consideration of Alternatives

NEPA requires that an EIS contain a "detailed statement" about "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C).  The regulations describe the discussion of alternatives as "the heart of the environmental impact statement."  40 C.F.R. § 1502.14 (1986).  The Tenth Circuit has held that it is "absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and *possible alternatives,* a requirement that we have characterized as the linchpin of the entire impact statement."  *All Indian Pueblo Council v. U.S.*, 975 F.2d 1437, 1444 (10th Cir. 1992) (emphasis in original).

In addressing alternatives to a proposed action in an EIS, federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a) (1986).  As to the reasonable alternatives, the agency must provide sufficient detail "to permit a reasoned choice of alternatives as far as environmental aspects are concerned."  *All Indian Pueblo Council*, 975 F.2d at 1445.  However, NEPA does not require agencies to analyze "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective."  *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir. 1984); *see also Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992) (agency did not err in rejecting alternative that was "too

speculative and dependent upon too many uncertainties."); *Airport Neighbors Alliance*, 90 F.3d 423, 432 (10th Cir. 1996) (agency properly denied consideration of alternative that required removal of existing facilities and was too costly).

Although over twenty alternatives were submitted during the planning process and an additional twenty were developed in response to comments and suggestions, the EIS here considered in detail the environmental impacts of only the No Action Alternative, Build Alternative, and the Phase I Alternative of the Vision Plan.  (A.R. 4144-4156; 7897; 8022-8028.)  It includes a detailed explanation of the components of each of these options, how these options would be implemented, detailed engineering drawings, and aerial photographs.  (AR 4144-4156.)  The DEIS then considers the relative environmental impacts of each of these alternatives.  It examines and compares the impact each alternative would have on the following categories: land use, interplay with regional transportation plans, parks, trails, and public recreation, public safety and security, visual quality and aesthetics, cultural resources, economics, utilities, energy, air quality, noise and vibration, geology, water resources and quality, biological resources, and hazardous materials.  (AR 4158-4226.) All other alternatives were discussed only briefly with a short explanation of why they had been eliminated during the screening process.  (AR 4129-36.)

Plaintiff argues that this violated NEPA because the FTA impermissibly failed to consider a number of other alternatives that were reasonable.  (ECF No. 34 at 25-33.) However, Plaintiff fails to cite a specific alternative that should have been considered in more detail.  Rather, Plaintiff argues that reasonable alternatives would have included an on-site commercial bus facility and room for possible expansion of passenger rail.

(*Id.*)

The record shows that both an on-site commercial bus station and the possibility of expansion of passenger rail were discussed repeatedly throughout the development process.  The commercial bus carrier in Denver—Greyhound—was intimately involved in the planning process but ultimately opted to keep its operations based out of its current location rather than relocate services to DUS.  (AR 21761.)  Greyhound informed the planning committee that the estimated expense of moving its operations was too high.  (*Id.*)

The passenger rail community also was extensively involved with the planning process.  Ultimately, however, expansion of rail travel was not made a priority because there is no funding for it.  As RTD noted in a letter in the administrative record: "There is no entity in Colorado with the legal authority to finance, construct or operate a front-range commuter rail serve beyond the bounds of the RTD and no funding in place to acquire right of way or cars for any such service."  (AR 15049.)

An agency is not required to consider every possibility or every desire in an EIS; rather, it is only required to consider reasonable alternatives.  Both expansion of passenger rail travel and an on-site commercial bus terminal were thoroughly explored during the planning and screening process.  Given the lack of current funding and the uncertainty of any future funding, it was not an abuse of discretion to eliminate alternatives that included an on-site commercial bus facility or the expansion of passenger rail travel.  *See Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992) (agency did not err in rejecting alternative that was "too speculative and dependent upon too many uncertainties.")*; Seacoast Anti-Pollution*

*League v. Nuclear Regulatory Commission*, 598 F.2d 1221, 1222-23 (1st Cir. 1979)

(agency not required to consider alternative that was "wholly theoretical"); *Prairie Band*

*of Pottawatomie Nation v. Federal Highway Administration*, 751 F.Supp.2d 1174, 1195

(D. Kan. 2010) (where FHWA "reasonably and in good faith concluded" that alternative

"was too impractical or ineffective with respect to the project's purpose and need",

failure to consider that alternative did not violate NEPA).

Plaintiff also argues generally that the EIS failed to give adequate reasons for

eliminating various alternatives.  NEPA requires only that FTA provide a good faith

basis for why an agency decided that an alternative was not reasonable and did not

merit further consideration.  *Hunt*, 749 F.2d at 1467 (NEPA satisfied when agency

provided reasonable explanation for why alternatives were rejected); *All Indian Pueblo*,

975 F.2d at 1445 (where EIS showed that the agency considered an alternative and

gave plausible reasons for why it was rejected, the agency has adequately considered

such alternative for purposes of NEPA).  Here, the DEIS includes a discussion of all of

the alternatives that were proposed during the screening process.  (AR 4129-36.)  It

explains the four-tier screening process that was used to identify which of the proposed

alternatives merited further consideration.  (AR 4123.)  The DEIS then explains how

each tier was implemented, which alternatives were rejected at each step, and on what

basis each alternative was rejected.  (AR 4138-40.)  The reasons for excluding the

rejected alternatives are reasonable; they range from failure to satisfy the minimum

passenger carrying capacity requirements to space constraints to poor connectivity

between transportation modes.  (*Id*.)  Thus, the Court finds that FTA has provided a

good faith explanation for why each of the non-chosen alternatives was rejected and has thereby satisfied NEPA in this respect.

Finally, Plaintiff argues that selection of the Build Alternative was itself arbitrary and capricious because the Build Alternative does not satisfy the purpose and needs of the project.  This appears to be an argument that FTA made the wrong choice for its preferred option.  The Court understands that Plaintiff, as a passenger rail association, wishes that the preferred option had placed greater emphasis on the expansion of rail travel.  However, the law is perfectly clear that NEPA is not results-oriented; it is process-oriented.  Under NEPA, the Court does not determine whether an agency arrived at the right result through its EIS process.  Rather, the Court determines only whether the agency followed the right process.  *Robertson*, 490 U.S. at 350 ("it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."); *see also Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1374 (10th Cir.1980) (explaining that the "requirements of NEPA . . . apply to procedure and do not undertake to control decision making").

The DUS project went through an extensive planning process.  Public meetings were held on a regular basis to discuss all aspects of the project.  The alternatives were presented to the public, discussed at public meetings, and ultimately eliminated at public meetings.  The entire process used to select the Build Alternative as the preferred option was transparent and was subjected to intense public scrutiny.

Ultimately, FTA had the discretion to determine which alternative best satisfied the purpose and needs of the project.  So long as it took a hard look at the possible options and legitimately assessed their relative values before selecting the preferred

Case 1:09-cv-01135-WJM-KMT   Document 109   Filed 12/30/11   USDC Colorado   Page 32 of 35


option, it has satisfied its NEPA obligations.  *Dubois v. United States Dept. of Agriculture*, 102 F.3d 1273, 1289 (1st Cir. 1996) ("The agency has discretion to balance competing concerns and to choose among alternatives, but it must legitimately assess the relative merits of reasonable alternatives before making its decision.").  The Court finds that the process undertaken here has satisfied NEPA.  *Utahans for Better Transp.*, 305 F.3d at 1163 (court's role in reviewing NEPA action is to ensure that process was sufficient to satisfy NEPA's "goals of informed decisionmaking and informed public comment.").

**D.      Standing to Pursue Section 4(f) Claims**

Plaintiff contends that the EIS process failed to comply with Section 4(f)[7] of the Department of Transportation Act of 1966 by failing to consider alternatives that would have had less impact on the historic nature of DUS.  (ECF No. 34 at 46-50.)  FTA responds by raising the issue of whether Plaintiff has standing to pursue a claim under Section 4(f).  (ECF No. 41 at 75.)

There are two aspects of standing under the APA, strict Article III standing and the judicially created doctrine of prudential standing.  *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) (standing inquiry involves constitutional limitations on federal court jurisdiction and prudential limitations on its exercise).  To satisfy the requirement of prudential standing, a party seeking review of an agency determination under the APA must show that it has "suffer[ed] a legal wrong" or been "adversely affected or aggrieved by agency action within the meaning of a relevant statute".  5 U.S.C. § 702.

_____

[7]  The statute is termed "Section 4(f)" in reference to its numbering the Department of Transportation Act of 1966, Pub. L. 89-670, 80 Stat. 931.

The Supreme Court has held that to be "adversely affected or aggrieved . . . within the meaning of a relevant statute" for purposes of Section 702, a plaintiff "must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883 (1990).

Another layer to the issue of standing in this case is that Plaintiff in this lawsuit is an organization. An organization has representational standing when (1) at least one of its members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

To examine standing in this case, the Court must first determine what interest Plaintiff seeks to protect in pursuing its Section 4(f) claim. Plaintiff's Section 4(f) claim implicates two statutes, the National Historic Places Act ("NHPA") and the Department of Transportation Act ("DOTA"). Under Section 4(f) of DOTA, 49 U.S.C. § 303(c), federal funding of a transportation project that adversely effects a historic site cannot be approved unless the agency shows that there is no feasible and prudent alternative to the use of the site and that it has done all possible planning to minimize harm to the site. Similarly, the NHPA requires that any federally funded undertaking "take into account the effect of the undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register" of Historic Places.

*See* 16 U.S.C. § 470f.

At the heart of both of these statutes is protection of historic places and the need to consider the historic nature of a place in evaluating alternatives within the NEPA framework.  To establish organizational standing, Plaintiff must show that "the interests it seeks to protect are germane to the organization's purpose."  *Hunt*, 432 U.S. at 343.  "The burden is on the party seeking review under § 702 to set forth specific facts (even though they may be controverted by the Government) showing that he has satisfied its terms."  *Lujan*, 497 U.S. at 883.  Plaintiff is an organization that "works to develop, preserve and improve passenger rail services in and through the State of Colorado and the nation. [Plaintiff] supports efforts to provide multi-modal solutions to Colorado's growing transportation problems. [Plaintiff] believes that passenger rail in some of the state's busiest corridors can provide a mobility choice for travelers who either cannot or do not wish to drive."  (Compl. ¶ 2.)  Nothing in the record shows that protecting the historical nature of Union Station falls within the zone of interests of Plaintiff or any of its members.

Because Plaintiff bears the burden of establishing standing and has failed to do so, the Court finds that Plaintiff lacks standing to raise a challenge under Section 4(f) of DOTA or the NHPA.  *Lujan*, 497 U.S. at 883.

## E.   Need to Prepare Supplemental EIS

For the first time in its reply brief, Plaintiff argues that FTA violated federal law by changing the preferred option between the DEIS and FEIS.  Federal regulations provide that an agency "[s]hall prepare supplements to either draft of final environmental impact

statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); *see also* 33 C.F.R. § 230.13(b).

Tenth Circuit law is clear that "a party waives issues and arguments raised for the first time in a reply brief." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009). Plaintiff's fifty-five page opening brief is silent with respect to any argument about the need to prepare a supplemental EIS. Accordingly, the Court finds that Plaintiff waived this argument and the Court need not consider it.

## IV.  CONCLUSION

For the reasons set forth above, the Court AFFIRMS the October 18, 2008 Record of Decision. Judgment shall be entered forthwith in favor of Defendant.

Dated this 30th day of December, 2011.

BY THE COURT:

William J. Martinez
United States District Judge